UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
ERIC S. SIGMEN,

                       Plaintiff,                **MEMORANDUM & ORDER**

    -against-
                                  Civil Action No. 13-0268

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                      Defendant.
--------------------------------------------------------X

**APPEARANCES:**

**MELTZER, FISHMAN, MADIGAN & CAMPBELL**
Attorneys for Plaintiff
225 Broadway, Suite 2605
New York, New York 10007
By: Edward J. Madigan, Esq.

**LORETTA E. LYNCH**
**UNITED STATES ATTORNEY**
Attorney for Defendant
271-a Cadman Plaza East
Brooklyn, New York 11201
By: Artemis Lekakis, Assistant U.S. Attorney
    Kathleen A. Mahoney, Assistant U.S. Attorney

**HURLEY, Senior District Judge:**

## INTRODUCTION

        Plaintiff Eric C. Sigmen  ("plaintiff") brings this action pursuant to 42 U.S.C.

§ 405(g) seeking judicial review of a final decision by the Commissioner of Social Security (the

"Commissioner" or "defendant") which denied his claim for disability benefits.  Presently before

the Court is defendant's motion for judgment on the pleadings pursuant to Federal Rule of Civil

Procedure ("Rule") 12(c) affirming the decision of the Commissioner and dismissing this action.

For the reasons discussed below, the motion is denied and the matter remanded to the Commissioner for further proceeding consistent with this opinion.

## BACKGROUND

### I. Procedural Background

On October 3, 2011, plaintiff filed an application for disability benefits alleging an inability to work as of March 22, 2011 due to "pain in his neck radiating down shoulder, arm [and] lower back." (Tr. 10, 187.) The initial claim was denied and a request for hearing filed. (Tr. 10, 57, 60-67.) A hearing was held on September 7, 2012 before Administrative Law Judge ("ALJ") April M. Wexler. (Tr. 22-56.) In a decision dated September 27, 2012, the ALJ found plaintiff was not disabled. (Tr. 7-21.) Plaintiff sought review of the unfavorable decision by the Appeals Council. (Tr. 235-36.) On November 26, 2012, the Appeals Council denied the request for review, which made the decision of the ALJ the final decision of the Commissioner. (Tr. 1-6.) This action was thereafter commenced on January 16, 2013.

### II. Factual Background

#### A. Non-Medical Evidence

Plaintiff was born on October 6, 1970. His education consists of "some college." (Tr. 27-28.) Plaintiff was employed by United Parcel Service for eighteen years, first as a loader (seven years) and then as a delivery truck driver (eleven years). (Tr. 26-29.) As a driver, plaintiff made package deliveries to businesses and residences. (Tr. 29.) Packages weighed "up to 150 pounds." (Tr. 29.) Plaintiff tried not to lift the packages himself and received assistance from others, if available, and used a hand truck. (*Id*.) Plaintiff stopped working and went out on workers' compensation on March 22, 2011 due to neck pain originating from a June 2005 injury.

(Tr. 29-30.)   On May 23, 2012, plaintiff began receiving a disability pension from United Parcel

service.  In August 2012 plaintiff entered into a lump sum settlement of his workers'

compensation claim and stopped collecting workers' compensation.  (Tr. 162-166.)

At the hearing before the ALJ plaintiff testified that he has lower back, shoulder, feet and

hand pain.  He has received epidural shots for neck pain, underwent back surgery in June 2012

and attended physical therapy sessions.  (Tr. 31-36) He took Neurontin and Percocet and used

Lidoderm patches, all as needed, and reported side effects of dizziness, nausea and fatigue. (Tr.

35, 44.)  He often used a TENS unit for his neck and wears a neck or back brace as needed. (Tr.

46-47.)  He also would go into his hot tub for some relief.  (Tr. 44.)  He also testified that he has

asthma for which he used an inhaler as needed and was never hospitalized. (Tr. 48-49.)

Plaintiff also testified about his daily activities.   He lived in a house with his wife and two

children, aged six years and five months.  (Tr. 28.)  He cared for his two daughters while his wife

worked full time out of the home and described himself as a "stay-at-home dad."  (Tr. 39.)  He

drove and went out for errands such as food shopping and going to the bank. Plaintiff fed his

infant daughter, changed her diapers and took her for walks; he ensured his older daughter made

the morning bus and in the afternoon retrieved her from the bus . (Id.)  Plaintiff testified that he

was able to dress himself, read, use the computer, watch television, and "tinker" in the garden.

(Id.)   He also cooked, did laundry, mowed the lawn once a week and went outside.  (Tr. 41-43.)

Plaintiff stated that he could only sit for thirty minutes and stand ten to fifteen minutes "without

being bothered."  (Tr. 41.)  He usually does not pick up anything heavy but does pick up his

daughter who weighs fifteen pounds.  He can mow the lawn once a week but testified that four

hours later he's "crippled.  Its not like I can't do it; it's the after effect."  (Tr. 43.)

**B.  Medical Evidence**

**<u>Marc J. Yland, M.D.</u>**

Plaintiff first visited Marc. J. Yland, M.D. on February 20, 2009, and continued to see Dr. Yland through 2010 with a chief complaint of lower back pain.  Plaintiff underwent an MRI of his cervical spine on March 4, 2009 which showed that the C3-C4 neural foraminal narrowing present on an earlier July 7, 2005 MRI was unchanged.

On March 7, 2011 plaintiff saw Dr. Yland with a chief complaint of neck pain, which plaintiff described as "somewhat manageable."  He reported transient improvement following his November 5, 2010 cervical epidural.  (Tr.. 283, 332-33, 348-49) On March 29, 2011 plaintiff again saw Dr. Yland with complaints of severe left neck and arm pain, which plaintiff noticed after his work route became more strenuous. (Tr. 284.)  After examination, Dr. Yland found that extension and rotation provoked pain down the left arm.  He recommended physical therapy, re-schooling, and possible cervical epidural treatment, and prescribed Percocet and continued use of a TENS unit..  (Tr. 284.)

Plaintiff saw Dr. Yland on April 13, 2011 and May 6, 2011 regarding his neck pain.  On the latter date he received a facet joint cervical spinal injection from Dr. Yland.  (285, 293.) Returning on May 13, 2011 plaintiff reported excellent improvement of his neck pain after the injection but that he had developed lower back pain over the weekend.  On examination, straight leg raises were positive on the right with crossover from the left, and lumbar spine flexion was provocative at 30 degrees. (Tr. 286.)  Gait was antalgic and plaintiff's posture appeared asymmetric and stooped.  There was difficulty with leg stance and plaintiff was unable to

perform toe and heel walking. (Tr. 286.) Dr. Yland diagnosed intervertebral disc disorder, radiculitis, facet syndrome and myofascial pain.

At the May 18, 2011 examination, Dr. Yland noted significant improvement in Plaintiff's lower back pain from using Lidoderm, Neurontin and a TENS unit. However, Plaintiff said his right neck pain had flared up into his right shoulder. On examination, straight leg raising was negative bilaterally, lumbar spine flexion was 90 degrees, and extension limited to fifteen degrees. Gait was nonantalgic. Cervical spine extension and rotation was provocative with pain into the right shoulder with paraspinal muscle spasm. Plaintiff was advised to continue his medications, using Lidoderm patch and TENS unit, and follow up in one month. (Tr. 287.)

Plaintiff returned to Dr. Yland on June 13, 2013. Dr. Yland noted that plaintiff had been advised not to consider surgery at this point. Plaintiff stated he found Neurontin helpful and had stopped taking the Percocet after his back pain subsided. Dr. Yland advised Plaintiff to continue using a Lidoderm patch and follow up in a month. (Tr. 288.)

On July 11, 2011, Plaintiff told Dr. Yland that his back pain was in remission, and he was primarily concerned about his neck. Plaintiff continued to use Percocet for breakthrough pain and was advised to follow up in one to two months. (Tr. 289.) He saw Dr. Yland again in August and September 2011. The doctor refilled his prescriptions and advised him to follow up in one month and continue therapy, massage therapy, and electric stimulation. (Tr. 290-91.)

At his October 24, 2011 examination plaintiff claimed it was painful for him to make a fist; upon examination plaintiff retained full motor strength. Dr. Yland refilled Plaintiff's prescriptions and told him to follow up in one month. (Tr. 330.)

On November 22, 2011, Plaintiff returned to Dr. Yland for neck pain. (Tr. 331.) Plaintiff

had been using Percocet for breakthrough pain. (Tr. 331.) Dr. Yland refilled Plaintiff's prescriptions and instructed him on appropriate precautions and limitations. (Tr. 331.) On January 16, 2012, Plaintiff saw Dr. Yland again. (Tr. 352.) They discussed the potential for surgery and Dr. Yland refilled Plaintiff's medication prescriptions with a scheduled follow up in one month. (Tr. 352.)

On February 13, 2012, Plaintiff told Dr. Yland that he had worsening neck pain. (Tr. 455.) Plaintiff had more weakness in both hands, as well as occasional numbness. Dr. Yland refilled Plaintiff's prescriptions and recommended surgery as an option. (Tr. 455.)

On March 2, 2012, Dr. Yland's examination revealed "limitations" in flexion, extension, and rotation in the cervical and lumbar spines. Dr. Yland opined that Plaintiff could not continue working in a job that required lifting, pushing heavy objects and/or repetitive activity related to his wrists and hands. (Tr. 456.)

On March 26, 2012, Dr. Yland noted that Plaintiff continued to use Percocet, Baclofen and Lidoderm patches to address his pain. Dr. Yland refilled Plaintiff's prescriptions and concurred with surgical considerations. Dr. Yland opined that Plaintiff was permanently and totally disabled from working his usual job at UPS. (Tr. 457.)

On April 23, 2012 Plaintiff visited Dr. Yland. Plaintiff was not using a cane or walker. He reported a back pain flare-up during the prior week but it had dissipated. Examination showed negative straight leg raising bilaterally. Lumbar spine flexion and extension were non-provocative on the extremes of motion. Plaintiff could rise from a sitting position without any symptoms, and his posture was symmetric. Considering that Plaintiff's lower back pain was incidental rather than continuous, Dr. Yland recommended against lumbar intervention, but

recommended that Plaintiff continue to use the TENS unit. (Tr. 458.)

Plaintiff saw Dr. Yland on July 9, 2012 and received a lumbar epidural treatment; at his August 7, 2012 visit his prescriptions were refilled.  (Tr 458-59.)

### Drs. Ira and Marc Chernoff, M.D.s

The record contains treatment notes from orthopedic surgeons, Drs. Ira and Marc Chernoff (collectively "Dr. Chernoff") for the period March 2011 through August 2012.  On March 7, 2011, Plaintiff visited Dr. Chernoff with a chief complaint of neck pain. Upon physical examination, Plaintiff could perform cervical flexion chin to chest, hyperextension to 30 degrees, but lateral rotation was not to 70 degrees.  Deep tendon reflexes were symmetric in the upper and lower extremities, and sensation remained intact in the upper extremities. Plaintiff retained full strength (5/5) in the deltoids, biceps, triceps, wrist flexors, wrist extensors, and interossei, and in grip strength. Dr. Chernoff diagnosed cervicalgia with degenerative changes and disc desiccation with disc osteophyte complex at C6-C7 and chronic neck pain. The doctor recommended Plaintiff re-start physical therapy, which plaintiff had stopped attending, and to return for a follow up visit in two months. (Tr. 264-65.).

On May 16, 2011, Plaintiff followed up for his neck pain with Dr. Chernoff.  Dr. Chernoff noted that Plaintiff had received trigger point injections, visited a chiropractor and was attending physical therapy. Plaintiff's medications were Synthroid, Lidoderm patches, Percocet, Neurontin, Advil and Ventolin inhalers.  Plaintiff was ambulatory, and he performed cervical flexion from chin to chest with hyperextension to 30 degrees and lateral rotation to 60 degrees bilaterally.  Dr. Chernoff diagnosed cervicalgia, degenerative changes, disc desiccation with disc osteophyte complex C6-C7 and chronic neck pain.  Dr. Chernoff recommended that Plaintiff

follow up with Dr. Yland, continue seeing the chiropractor, continue physical therapy and return for a follow-up in six weeks. (Tr. 266-67.)

On June 27, 2011, Plaintiff saw Dr. Chernoff, and complained of neck pain, shoulder pain, arm numbness and lack of sleep.  Plaintiff's medications were Synthroid, Lidoderm patches, Percocet, Neurontin and Advil.  Plaintiff performed cervical flexion from chin to one inch of chest with hyperextension to 30 degrees and lateral rotation to 70 degrees bilaterally.  Dr. Chernoff diagnosed cervicalgia with degenerative changes and disc desiccation with disc osteophyte complex C6-C7 and chronic neck pain. Dr. Chernoff advised Plaintiff to continue seeing Dr. Yland for pain management. (Tr. 268-69.)

On August 22, 2011, Plaintiff visited Dr. Chernoff with complaints of neck pain, back pain and headaches.  Plaintiff engaged in weekly chiropractic care and physical therapy twice a week. Plaintiff's medications were Synthroid, Lidoderm patches, Percocet and Neurontin. On physical examination, Plaintiff was ambulatory, performed cervical flexion from chin to one inch of chest, hyperextension to 30 degrees and lateral rotation to 70 degrees bilaterally.  Dr. Chernoff recommended that Plaintiff continue with physical therapy and chiropractics and return for a follow-up in six weeks. (Tr. 270-71.)

On October 24, 2011, Plaintiff saw Dr. Chernoff for follow-up of neck pain, hand pain and sciatic pain.  The doctor noted that Plaintiff wanted to proceed with surgery but that surgery was not advisable until a discogram could be performed as it would determine whether surgery was indicated.  Plaintiff's medications were Synthroid, Percocet, Lidoderm patches, Neurontin and Advil.  On examination, Plaintiff was ambulatory, showed a cervical range of motion of one inch chin to chest, and his hyperextension was 30 degrees past neutral and lateral rotation was to

70 degrees bilaterally. Dr. Chernoff diagnosed cervicalgia with degenerative changes, disc desiccation and disc osteophyte complex C6-C7 with chronic neck pain. (Tr. 354-55.)

On December 5, 2011, Plaintiff visited Dr. Chernoff complaining of neck pain radiating into his hand (side unspecified) and sciatic pain. On physical examination, Plaintiff was able to forward bend his neck to one inch chin on chest and had hyperextension to 30 degrees and rotation to 70 degrees. Dr. Chernoff diagnosed chronic neck pain with degenerative changes at C6-7. Dr. Chernoff was awaiting approval for a C6-C7 spinal fusion, but noted that there were "no guarantees with that type of surgery." Dr. Chernoff recommended Plaintiff continue with chiropractic care and physical therapy. (Tr. 356.)

On January 16, 2012, Dr. Chernoff examined Plaintiff for neck pain, wrist pain, muscle tension, and right arm pain radiating into his right hand, thumb middle finger and ring finger. Plaintiff reported experiencing serious pain over the weekend but was having a "good day" on the date of the appointment. Plaintiff's medications were Synthroid, Percocet, Neurontin and Lidoderm patches. On physical examination, Plaintiff showed a neck range of motion to one inch of chin on chest, hyperextension to 30 degrees and rotation to 70 degrees. Dr. Chernoff diagnosed chronic neck pain with degenerative changes at C6-C7, and again discussed spinal fusion surgery with Plaintiff. (Tr. 357-58.)

On February 10, 2012, Plaintiff returned to Dr. Chernoff with complaints of neck pain, shoulder pain, arm pain and hand pain. Workers' Compensation had denied the discogram request, but Plaintiff still wanted neck surgery. Medications consisted of Synthroid, Percocet, Neurontin and Lidoderm patches. Plaintiff's physical examination was unchanged from his prior visit; he showed a neck range of motion to one inch of chin on chest, hyperextension to 30

degrees, and rotation to 70 degrees. The doctor diagnosed chronic neck pain with degenerative changes at C6-C7. Dr. Chernoff and Plaintiff discussed potential surgical intervention. (Tr. 359-360.)

On April 6, 2012 Dr. Chernoff again examined plaintiff: he performed cervical flexion one half inch chin to chest, hyperextension was 30 degrees and lateral rotation was 80 degrees bilaterally. Testing showed full muscle strength (5/5). Dr. Chernoff diagnosed chronic neck pain, significant degenerative changes at C6-7 and multilevel degenerative disc disease. The doctor recommended a new MRI and a cervical spine discogram. (Tr. 425.)

At an April 20, 2012, examination by Dr. Chernoff, plaintiff performed cervical flexion from one and one-half inches chin to chest, hyperextension was 30 degrees, and lateral rotation was 80 degrees bilaterally. Dr. Chernoff reviewed the April 13, 2012 MRI and noted there was disc desiccation at C6-C7 and right paracentral disc herniation at C3-C4 with disc osteophyte complex. While Plaintiff expressed an interest in surgical intervention, Dr. Chernoff recommended a discogram to determine whether plaintiff was an appropriate candidate for surgery. (Tr. 428.)

On June 5, 2012, Plaintiff underwent a cervical discectomy and fusion performed by Dr. Chernoff at St. Charles Hospital. Plaintiff tolerated the surgery well without any complications. On discharge, he was advised to follow a regular diet, wear a soft collar and perform no strenuous activity. He was to follow up with Dr. Chernoff in five to seven days. (Tr. 432-40.)

On June 15, 2012, Dr. Chernoff saw Plaintiff for post surgery follow-up. Plaintiff complained of neck and low back pain, as well as some "knots" in the back. His medications were Synthroid, Percocet and ibuprofen. Dr. Chernoff instructed Plaintiff to stop any use of

ibuprofen as anti-inflammatories could delay fusion. Dr. Chernoff advised Plaintiff to "take it easy and not to do any heavy lifting." (Tr. 445.) Shortly thereafter, Dr. Chernoff fitted Plaintiff for a bone growth operator and prescribed Valium for Plaintiff's reported muscle spasms. (Tr. 446.)

A six week post surgical evaluation was performed by Dr. Chernoff on July 16, 2012. Plaintiff reported some residual neck pain, as well as back pain and headaches. Upon examination, Plaintiff performed cervical flexion, extension and lateral rotation, and his incisional scar was well-healed. He stated he had some pain with lateral rotation and bending. Plaintiff showed good upper extremity strength. Dr. Chernoff stated that "[a]t this point he is doing well." The physician encouraged Plaintiff to use his bone growth stimulator regularly. (Tr. 447.)

Plaintiff to returned to Dr. Chernoff on August 27, 2012. On examination, Plaintiff presented with a well-healed incisional scar and could perform cervical flexion, extension, and lateral rotation. Plaintiff continued to take Percocet and Lidoderm patches, and occasionally took Advil despite the doctor having advised against it. Dr. Chernoff noted that an x-ray of Plaintiff's cervical spine showed anterior cervical plate and screws in "excellent" position at C6-C7. X-rays taken that day of the bilateral acromioclavicular ("AC") joints indicated some degenerative changes. Dr. Chernoff diagnosed status post cervical discectomy and fusion at C6-C7. He gave Plaintiff an injection into his left AC joint and advised him to use ice on his shoulder. Plaintiff was to continue wearing the bone growth stimulator. Based on Plaintiff's complaints of pain after physical therapy, Dr. Chernoff advised Plaintiff to reduce or stop physical therapy. (Tr. 449-50.)

**MRI and Other Test Results**

On July 7, 2005 a cervical spine MRI showed a right lateral disc herniation at C3-C4 causing neural foraminal narrowing. Disc desiccation at C2-C3, C3-C4, and C4-C5 was mild. (Tr. 262.)

A cervical spine MRI was repeated on March 4, 2009. According to the report, the normal cervical curvature was well maintained. The cervical vertebral bodies were of normal height. There was no marrow replacement process and no compression fractures. Multilevel disk desiccation was present. At C3-C4 there was a right uncovertebral spurring with small right paracentral/right foraminal disc osteophyte complex with right uncovertebral spurring; this was unchanged from the previous MRI. At C6-C7 there was a small paracentral disc osteophyte complex asymmetric to left. There is left uncovertebral spurring with left foraminal narrowing; this was new from previous MRI evaluation. (Tr. 340.)

A left ankle MRI study was performed on January 28, 2010. It revealed nonspecific edema in association with mild retrocalcaneal bursitis and moderate peroneus longus tendinosis with focal moderate tear just prior to the cuboid tunnel. (Tr. 441, 443.) This was treated by Dr. Frank Desio, who in October 2010 did not place any restrictions on plaintiff's activity but noted that the "foot problems could be a result of repetitive motion from [plaintiff's] job." (Tr. 442.)

On January 3, 2011 another cervical spine MRI was conducted. The radiologist concluded after a side by side comparison with the March 4, 2009 MRI "that there has been essentially no interval change in the multilevel degenerative disk disease affecting cervical spine. The exiting left C7 nerve root compression at the C6-7 level was present on the previous

examination as well.  (Tr. 342.)

On March 25, 2011, Plaintiff underwent an electromyography and nerve conduction study of his upper extremities. The studies showed bilateral sensory peripheral neuropathy in the upper extremities with superimposed left sensorimotor median neuropathy at the wrist consistent with carpal tunnel syndrome, but no evidence of cervical radiculopathy. Lam Quan, M.D., recommended that Plaintiff follow up with his physician, continue current symptom management, refrain from strenuous activities and repeat the studies in one year if his symptoms progressed or persisted. (Tr. 237-41.)

On May 14, 2011 Plaintiff underwent an MRI of the lumbar spine.  The imaged vertebrae demonstrated normal height and anteposterior alignment. The marrow signal was preserved and the STIR images demonstrated no evidence of marrow edema.  At L2-L3 there was a right paracentral small disc herniation with associated annular tear that contacts the ventral thecal sac without significant spinal canal or neural foraminal narrowing.  At L4-L5 there was a far lateral disc herniation with associated mild annular tear that contributed to mild right neural foraminal stenosis. At L5-S1 there was disc bulging and left foraminal disc herniation resulting in mild narrowing of the bilateral neural foramina. (Tr. 338-39.)

An April 13, 2012 MRI of Plaintiff's cervical spine revealed mild right C3-C4 and mild left C6-C7 neural foraminal narrowing due to uncovertebral hypertrophy. Furthermore, the MRI showed no evidence of any focal disc herniation or cervical spinal canal stenosis at C3-C4, C6-C7, or any other locations in the cervical spine. ( Tr. 429-30.)

### **Vocational Expert's Testimony**

Edna Clark, an impartial vocational expert (Tr. 127-28), testified at the administrative

hearing. She testified that Plaintiff's past relevant work as a UPS driver was defined in the Dictionary of Occupational Titles (DOT) as a semi-skilled occupation performed at a medium level of exertion. (Tr. 50.) The ALJ posed a hypothetical question to the vocational expert, asking her to take into account an individual of Plaintiff's age and education and to further assume that the individual was limited to sedentary work, could occasionally lift ten pounds, sit for approximately six hours, stand or walk for approximately two hours in an eight-hour day with normal breaks, occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, occasionally balance, stoop, kneel, crouch, and crawl, perform unlimited pushing and pulling, frequently perform gross manipulation, handling, and feeling, and must avoid concentrated exposure to extreme heat, cold, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation. (Tr. 50-51.) The vocational expert testified that such an individual could not perform Plaintiff's past work as a UPS driver. (Tr. 51.) However, she opined that there was other work in the national or local economy that such an individual could perform. (Tr. 51.) For example, such an individual could perform the occupation of surveillance system monitor (DOT No. 379.367-010), which constituted 34,000 jobs nationally and 1,900 jobs locally. (Tr. 51.) This individual also could work as a cuff folder (DOT No. 685.687-014), numbering 2,000 jobs nationally and 400 jobs locally. (Tr. 53.) Further, this hypothetical individual could do the work of new account clerk (DOT 205.367-014), which represented 10,000 jobs nationally and 1,700 jobs locally. (Tr. 49-53.)

**DISCUSSION**

**I.      Standard of Review**

**A.      Review of the ALJ's Decision**

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  The Court may set aside a determination of the ALJ only if it is "based upon legal error or is not supported by substantial evidence."  *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal quotation marks and citation omitted).  "Substantial evidence is 'more than a mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to support a conclusion.'"  *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Furthermore, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the case de novo.  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (internal quotation marks and citation omitted).  Thus the only issue before the Court is whether the ALJ's finding that Plaintiff was not eligible for disability benefits was "based on legal error or is not supported by substantial evidence."  *Rosa*, 168 F.3d at 77.

**B.      Eligibility for Disability Benefits**

To be eligible for disability benefits under the Social Security Act (the "SSA"), a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA further states that this impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id*. § 423(d)(2)(A).

The SSA has promulgated regulations prescribing a five-step analysis for evaluating disability claims. See 20 C.F.R. § 404.1520. This Circuit has described the procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa*, 168 F.3d at 77 (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

C.	**The Treating Physician Rule**

Social Security regulations require that an ALJ give "controlling weight" to the medical opinion of an applicant's treating physician so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa*, 168 F.3d at 78-79.  The "treating physician rule" does not apply, however, when the treating physician's opinion is inconsistent with the other substantial evidence in the record, "such as the opinions of other medical experts." *Hallora*n, 362 F.3d at 32; *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).  When the treating physician's opinion is not given controlling weight, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion." *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)).  These factors include: (1) the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors that are brought to the attention of the Social Security Administration that tend to support or contradict the opinion.  *Id*. § 404.1527(d)(2)(I-ii) & (d)(3-6); *see also Halloran*, 362 F.3d at 32.  Furthermore, when giving the treating physician's opinion less than controlling weight, the ALJ must provide the claimant with good reasons for doing so.  20 C.F.R. § 404.1527(d)(2).

In addition, it is clearly stated law in the Second Circuit that "while a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence." *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003) (emphasis added); *see also*

*Rivera v. Sullivan*, 923 F.2d 964 (2d Cir. 1991) (reviewing Second Circuit law on retrospective diagnosis and reversing denial of benefits where retrospective diagnosis of treating physician not given sufficient weight with regard to degenerative condition).

Finally, the ALJ may not reject the treating physician's conclusions based solely on inconsistency or lack of clear findings without first attempting to fill the gaps in the administrative record. *Rosa*, 168 F.3d at 79. "It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding,'" even if the claimant is represented by counsel. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Secretary of HHS*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Butts v. Barhart,* 388 F.3d 377, 386 (2d Cir. 2004) ("'It is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits.'") (quoting *Seavey v. Barnhart*, 276 F.3d 1, 8 (1st Cir. 2001)), amended on other grounds on rehearing, 416 F.3d 101 (2d Cir. 2005). Specifically, this duty requires the Commissioner to "seek additional evidence or clarification" from the claimant's treating sources when their reports "contain[ ] a conflict or ambiguity that must be resolved" or their reports are "inadequate for [the Commissioner] to determine whether [claimant] is disabled." 20 C.F.R. §§ 404.1512(e), (e)(1). The Commissioner "may do this by requesting copies of [the claimant's] medical source's records, a new report, or a more detailed report from [the claimant's] medical source." Id. § 404.1512(e)(1). The only exception to this requirement is where the Commissioner "know[s] from past experience that the source either cannot or will not provide the necessary findings." Id. § 404.1512(e)(2). If the information obtained from the claimant's medical sources is not sufficient to make a disability determination, or the

Commissioner is unable to seek clarification from treating sources, the Commissioner will ask the claimant to attend one or more consultative evaluations. *Id*. § 404.1512(f).

## II.     The ALJ's Decision

Applying the five-step analysis enumerated in 20 C.F.R. § 404.1520, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of March 22, 2011.   Proceeding to step two, the ALJ determined that plaintiff has the following severe impairments: cervical spinal defects, low back pain, asthma, and carpal tunnel syndrome. At step three, the ALJ concluded that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  The ALJ then determined that plaintiff retained the residual functional capacity (RFC) to perform sedentary work except he is limited to frequent gross handling and frequent feeling.  In addition, the ALJ found that plaintiff must avoid concentrated exposure to extremes of heat and cold, wetness, humidity, fumes, odors, dusts, gases and poor ventilation.  At step four the ALJ found that plaintiff was unable to perform past relevant work. At step five the ALJ determined that considering plaintiff's age, education, work experience, and residual functional capacity, jobs exist in significant numbers in the national economy that he can perform and thus found plaintiff was not disabled.  (Tr. 13-16.)

## II.  Summary of Arguments

In support of its motion, Commissioner argues that she was correctly determined plaintiff was not disabled as he retained the ability to perform a range of sedentary work, his credibility was correctly considered and there is work he can perform.

Plaintiff raises four arguments in support of his claim that the Commissioner incorrectly determined that he was not disabled. First, plaintiff contends that cervical and lumbar conditions identified in the summary of medical evidence with the course of medical treatment and objective testing meet listings 1:04 and 1:08 under 20 CFR 404, Part P, Index 1. Second, he maintains there was no evidence to support the position that he could lift ten pounds occasionally, sit for approximately six hours, and stand or walk for two hours. Third, he argues that the ALJ failed to obtain testimony of a medical expert to ascertain if he met or equaled Listings 1:04, 1:04A, 1:08 and 11:08. Finally he argues that the ALJ failed to forward medical evidence received after the hearing to the vocational expert and failed to include his shoulder and left ankle limitations in the hypothetical given to that expert. Plaintiff's memorandum falls woefully short of elucidating any of these arguments. Nonetheless, the Court has reviewed the record with these bar-boned arguments in mind.

**IV. The Matter is Remanded to Develop the Record**

After a careful review of the record in this case, the Court concludes that the ALJ failed to fully develop the record in accordance with applicable regulations. Specifically, because the ALJ did not request any of the treating doctor to opine on plaintiff's residual functional capacity (RCF), remand is required.

An ALJ's duty to develop the record includes ensuring that the record as a whole is complete and detailed enough to allow the ALJ to determine the claimant's RFC. *Casino-Ortiz v. Astrue*, 2007 WL 2745704, at *7 (S.D.N.Y. Sept 21, 2007), *report and recommendation adopted by*, 2008 WL 461375 (S.D.N.Y. Feb. 20, 2008). The absence of an RFC statement from the record does not necessarily make the record incomplete. *Id.* at *8. (citing 20 C.F.R. §

404.1513(b)(6).  However, where an RFC is lacking, the Commissioner must take the affirmative step of requesting one before making a disability determination.  *Johnson v. Astrue*, 811 F. Supp. 2d 618, 629 (E.D.N.Y. 2011).  In other words, the Commissioner has an affirmative duty to request RFC assessments from a plaintiff's treating sources despite what is otherwise a complete medical history.  *Id*. at 630.

An RFC determination indicates the most an individual can still do despite his or her impairments.  20 C.F.R. §404.1545(a).  It takes into consideration the claimant's physical and mental limitations, symptoms, including pain, and all other relevant evidence in the case record.  *Id.*  With respect to physical abilities, the RFC assessment includes consideration of an individual's exertional capabilities, including the ability to sit, stand, walk, lift, carry, push, and pull.  20 C.F.R. §404.1545(b).  Non-exertional limitations such as reaching, handling, stooping, or crouching are also considered.  *Id.*

The Commissioner contends that the record supports its finding that Plaintiff could do sedentary work: "The ALJ correctly points out the treatment notes from Dr. Chernoff and Dr. Yland did not reveal any restrictions precluding lighter forms of employment . . . . Dr. Chernoff only advised Plaintiff to 'take it easy' and not do any heavy listing. . . . Likewise, Dr. Yland opined that plaintiff could not work in a position requiring lifting, pushing heavy objects, and/or repetitive activity related to his wrists and hands . . . ."  Def. Mem at 18-19 (citations omitted.) This argument, however, ignores that "§ 404.1513(b)(6) states that a treating source's medical report should include '[a] statement about what [the claimant] can still do despite [his or her] impairments.'" *Robins v. Astrue*, 2011 WL 2446371, at *3 (E.D.N.Y. June 15, 2011).

Drs. Chernoff and Yland only state what plaintiff cannot do; it is unclear whether these

are the only restrictions placed on plaintiff and the record contains no statement from these treating doctors as what plaintiff can still do. Specifically, Dr. Yland wrote in his March 2, 2012 that "[c]learly [plaintiff] cannot *continue* to work in a position that requires lifting, pushing heavy objects and/or repetitive activity related to his wrists and hands." (Tr. 456 (emphasis added).) Two weeks later he wrote "clearly, the patient is permanently and totally disabled from working his usual job at UPS . . . ." (Tr. 457.) These statements address only the requirements of plaintiff's position at UPS. At the very least, it is unclear whether these are the extent of the limitations that Dr. Yland, in his professional opinion, believes are necessary. The ALJ had a duty to seek clarification from Dr. Yland rather than infer that Dr. Yland's functional preclusion regarding heavier work vis a vis plaintiff's position at UPS, supported the ability to perform some lighter form of employment. Similarly, Dr. Chernoff's statement that plaintiff should "take it easy" and "not do any heavy lifting" is not a clear statement of plaintiff's residual functional capacity and the ALJ should have sought clarification. *See Felder v. Astrue*, 2012 WL 3993594, *13 (E.D.N.Y. Sept. 11, 2012) (remanding matter so ALJ could adequately determine plaintiff's RFC where treating physician did not opine with requisite specificity on plaintiff's ability to perform sedentary work).

Thus, on remand the ALJ must seek clarification from plaintiff's treating sources as to their RFC assessment of plaintiff. To the extent the treating sources do not provide clarification, the ALJ should consider whether to seek expert testimony.

Finally, the ALJ should re-evaluate the evidence after requesting clarification and consider whether that reevaluation alters the assessment of plaintiff's credibility.

**CONCLUSION**

For the foregoing reasons, defendant's motion for judgment on the pleadings is denied

and the case is remanded to the Commissioner for further administrative proceedings consistent

with this decision. [1]

Dated: Central Islip, New York
     January 20, 2015                    /s/_____

                                                  Denis R. Hurley
                                                  United States District Judge

---

[1] The Court notes that plaintiff's memorandum merely requests a remand to another ALJ without any discussion thereof. Accordingly, the Court deems the issue waived. Moreover, there is no support in the record for plaintiff's assertion that he cannot receive a fair hearing before ALJ Wexler.